CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 0 1 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

JULIA A. WILLETT,　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Civil Action No. 7:06cv00041
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
JO ANNE B. BARNHART,　　　　　　　) By:　Hon. Michael F. Urbanski
COMMISSIONER OF SOCIAL SECURITY,　)　　United States Magistrate Judge
　　　Defendant.　　　　　　　　　　)

## MEMORANDUM OPINION

Plaintiff Julia A. Willett ("Willett") brought this action for review of the Commissioner of Social Security's decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383, ("Act"). The parties have consented to the undersigned's jurisdiction, and the case is before the court on cross motions for summary judgment. Having reviewed the record, and after briefing and oral argument, the case is now ripe for decision. Because the decision of the Commissioner is amply supported by substantial evidence and was legally correct, there is no basis for reversal or remand. Accordingly, the defendant's motion for summary judgment must be granted and this appeal dismissed.

### I.

Plaintiff was born on November 23, 1961, and completed high school and one year of college. (Administrative Record, hereinafter "R." at 17, 40, 56, 100) Plaintiff previously worked as a secretary and deputy clerk in the court system. (R. 17, 40-44, 105) Plaintiff filed applications for DIB and SSI with a protective filing date of August 22, 2003, alleging she became disabled on September 4, 2001, due to fibromyalgia, osteoarthritis, and mood

disorder/depression. (R. 19-20, 100, 104) Plaintiff's claims were denied at both the initial and reconsideration levels of administrative review, (R. 16), and an administrative hearing was held before an ALJ on October 20, 2005. (R. 34-82) In a decision dated November 21, 2005, the ALJ denied plaintiff's claims for DIB and SSI. (R. 25) The ALJ found that although plaintiff's fibromyalgia, osteoarthritis, and mood disorder/depression were severe, these conditions did not meet or medically equal a listed impairment. (R. 25) The ALJ also found that plaintiff's complaints of physical pain were not wholly credible, that she retained the residual functional capacity ("RFC") to perform some light work, and that a sufficient number of jobs exist for a person with her physical limitations. (R. 24-25)

The ALJ's decision became final for purposes of judicial review under 42 U.S.C. § 405(g) on December 17, 2005, when the Appeals Council denied plaintiff's request for review. (R. 8-11) Plaintiff then filed this action challenging the Commissioner's decision denying her claim for benefits.

## II.

Willett argues that the ALJ erred in determining that she was not disabled because he failed to give controlling weight to the opinion of one of her many treating physicians. In the alternative, Willett requests that the court remand this case to the Commissioner for consideration of new evidence detailing Willett's continuing treatment for her physical and mental ailments.

The Commissioner counters that the ALJ correctly determined that the opinion of one of Willett's treating physicians was entitled to very little weight because his opinion was not supported by acceptable clinical and laboratory diagnostic techniques and was inconsistent with

2

the totality of her medical records. Additionally, the Commissioner argues that the new evidence should not serve as a basis for remand because the evidence is not material and, thus, would not have impacted the ALJ's finding that Willett was not disabled.

Judicial review of disability cases is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the conditions for entitlement established by and pursuant to the Act. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). In making this substantial evidence determination, the court must consider whether the ALJ analyzed all of the relevant evidence and sufficiently explained his findings and his rationale for crediting or discrediting certain evidence. See Sterling v. Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997).

Therefore, the question presented is whether there is substantial evidence to support the ALJ's determination that Willett's treating physician's opinion was not entitled to controlling weight. The existing medical record at the time of the ALJ's decision amply supports his conclusion. Further, while the new evidence reveals that Willett continued to be treated for her physical and mental ailments, these records do not offer any new or material evidence. As such, the court finds the record is plainly sufficient to meet the substantial evidence standard and that the new evidence would not affect the ALJ's finding that Willett was not disabled.

3

### III.

Willett argues that the ALJ erred in not giving controlling weight to the opinion of Dr. Lemmer, one of her many treating physicians. On June 30, 2005, Dr. Lemmer completed an assessment of Willett's ability to do work-related activities. (R. 672-75) Dr. Lemmer indicated that Willett could occasionally lift less than ten pounds, could not frequently lift any weight, could stand and/or walk only two hours in an eight hour day, could sit less than six hours in an eight hour day, and had limited push/pull ability in her upper and lower extremities due to pain syndrome. (R. 672-73) Further, he found she could occasionally climb, balance, kneel, crouch, crawl, and/or stoop and had limited reaching, handling, or fingering ability. (R. 673-74) He also opined that Willet's impairments would cause her to be absent more than three times per month. (R. 675)

The ALJ determined that Dr. Lemmer's disability conclusion was entitled to little weight because his assessment was based primarily on Willett's subjective complaints of pain and it was inconsistent with his treatment notes and the clinical findings, diagnostic testing, and treatment notes of her other physicians. (R. 21-22) After considering all such evidence, the ALJ determined that Willett retained the RFC to lift ten pounds frequently, lift twenty pounds occasionally, and could stand and/or walk for up to six hours in a work day. (R. 22) Consistent with Dr. Lemmer's assessment, the ALJ determined that Willet should not engage in more than occasional pushing/pulling with her upper extremities and no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (R. 22)

The opinions of treating physicians are given controlling weight when those opinions are not conclusory and when they are well supported by medically acceptable clinical and laboratory

4

diagnostic techniques and are not inconsistent with other evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's opinion may be assigned little or no weight if it is conclusory and/or is not supported by objective testing or the record as a whole. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996) The ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Here, the ALJ did not disregard Dr. Lemmer's treatment notes and opinions expressed therein. However, he did discount Dr. Lemmer's disability assessment because it was conclusory and offered little clinical signs, findings, direct observation, or analysis of the underlying pathology or symptomatology which would support a finding that Willett's pain resulted in total disability. Additionally, the ALJ found that Dr. Lemmer's conclusion was inconsistent with his treatment records, diagnostic tests, and the treatment records of numerous other physicians.

## A.

Willet's first documented complaints of back pain in this record were in October, 1999 to Dr. Ward, at Carilion Family Medicine ("CFM"). (R. 231) Willett complained she had an old T12 vertebra fracture which was exacerbated after she moved several air conditioners. (R. 231) She was prescribed Vicodin and was advised to come in for a recheck if the pain worsened.[1]

---

[1] Vicodin is a brand name for acetaminophen and hydrocodone. Hydrocodone is a pain reliever and acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. Together, acetaminophen and hydrocodone are used to relieve moderate-to-severe pain. This drug combination sells under the brand names: Anexsia, Anolor DH5, Bancap HC, Dolacet, Lorcet 10/650, Lorcet HD, Lorcet Plus, Lortab, Lortab 10, Lortab 5/500, Lortab 7.5/500, Lortab Elixir, Norco, T-Gesic, Vicodin, Vicodin ES, Vicodin HP, Zydone. http://health.yahoo.com/drug/d03428a1

Case 7:06-cv-00041-mfu    Document 17    Filed 11/01/06    Page 5 of 25    Pageid#: 101

(R. 231) Willett made no further complaints of back pain until July 22, 2000, when she presented at the Lewis-Gale Medical Center ("LGMC") with complaints of pain in her lower back and thighs after picking up a chair and coffee table. (R. 587- 98) She was prescribed Vicodin and Flexeril, a muscle relaxer. (R. 589)

During a recheck for pneumonia at CFM on December 9, 2000, Willet advised Dr. Ward that she was taking Vicodin "occasionally." (R. 228) Dr. Ward wrote Willet another prescription for Vicodin and advised to follow up with Dr. Grayson, also at CFM. (R. 228) On December 11, 2000, she was examined by Dr. Grayson. (R. 227) During that visit she indicated she had some history of chronic back pain, had been seeing another physician, and now wanted a referral to a pain specialist. (R. 227) She was referred to Dr. Stelmack. (R. 227) Willett made several subsequent requests for pain medication at CFM. On December 19, 2000, Willett was given another Vicodin prescription and a prescription for Lortab. On December 27, 2000, her request for Vicodin was denied, but was subsequently approved on December 28, 2000, along with a new prescription for Hydrocodone. (R. 226-27)

Just a few days later, on December 15, 2000, Willett presented at Internal Medicine Associates ("IMA") indicating she wanted to establish a general care practitioner. (R. 654) During her exam, Willett advised Dr. Bolinger that she had chronic back pain. (R. 654-55) Dr. Bolinger directed her to get copies of her medical records from past care givers and return to the office in three months for any follow-up care. (R. 655) Less than one month later, on January 5, 2001, Willett returned with a chief complaint of depression, but during the course of the exam complained of back pain and requested a narcotic pain medication. (R. 652) Dr. Bolinger's notes read as follows: "I am not interested in prescribing any narcotics or any Benzodiazepines

6

or any controlled substances for this syndrome. The pain has been going on for 16 years and she has not provided me with any records." (R. 653) Instead, Dr. Bolinger provided Willett with a physical therapy referral and suggested exercise to relieve her pain and anxiety. (R. 653)

Meanwhile, Dr. Grayson referred Willett to Dr. Samarsinghe at Comprehensive Pain Management Centers. (R. 181-82) On January 9, 2001, Dr. Samarsinghe ordered a lumbrosacral x-ray series and an MRI, and he provided Willett with a Lorcet prescription. (R. 182) An MRI survey of the lumbar spine revealed a moderate/severe degree of intervertebral disc degeneration, end plate osteophyte formation, reactive subchondral hypertrophy, facet arthrosis, and a mild degree of retrolisthesis at the L5/S1 level. (R. 282, 305) There was no evidence of a herniated nucleus pulposus, spinal stenosis, or focal abnormality, and the L4/L5 intervertebral disc and those above appeared intact. (R. 282, 305) Additionally, a benign appearing compression deformity at the T12 vertebral body was noted. (R. 306) An x-ray of the lumbar spine revealed a chronic compression fracture of the T12 vertebra and mild spondylosis. (R. 284)

On February 7, 2001, following the x-rays and MRI study, Dr. Samarasinghe diagnosed Willett with multi-level degenerative disc disease, retrolisthesis at L5/S1, low back syndrome, and degenerative spinal arthrosis. (R. 180) She was seen again on March 20, 2001, for continuing lower back pain and radiating leg discomfort, and Dr. Samarasinghe indicated the need for medial branch test blocks to determine if her pain could be treated with radiofrequency lumbar facet denervation ("RF"). The lumbar medial branch block of Willett's right and left sides were completed on May 2, 2001 and June 1, 2001, respectively, with favorable pain relieving results. (R. 177-78) On June 27, 2001, due to the short-term relief provided by the

Case 7:06-cv-00041-mfu   Document 17   Filed 11/01/06   Page 7 of 25   Pageid#: 103

blocks, Dr. Samarasinghe recommended RF. (R. 176) However, she did not return for further treatment until October 9, 2001, due to a change in insurance. (R. 175)

In the interim, Willett sought treatment from both Drs. Grayson and Samarasinghe for left arm pain following a canoe flipping incident in which Willett claimed she was injured while hanging onto the boat. (R. 177) During his June 10, 2001 exam, Dr. Grayson informed Willett that her back was in good shape. (R. 223) Dr. Grayson found no swelling and only minimal pain, and prescribed Vioxx for her left elbow. (R. 223) Willett reported to Dr. Samarasinghe that she had a good response to the Vioxx for her elbow problem. (R. 176)

Willett returned to Dr. Bolinger on November 7, 2001 complaining of left-sided back pain which appeared after "trying to skin the cat recently for her son." (R. 165) Dr. Bolinger found that she had no spinal tenderness, but muscle spasms and slight tenderness in the left paraspinal muscles. (R. 165) He diagnosed her with back strain, prescribed Hydrocodone, and encouraged her to begin a program of walking. (R. 165) Two days later, Dr. Grayson renewed Willett's prescription for another pain reliever. (R. 222)

Willett was seen for chronic tendinitis in her elbow on December 4, 2001. (R. 220) J. Kimberly White, FNP, found that Willett was extremely tender to palpation over the left lateral epicondyle and that her grip strength was somewhat decreased. (R. 220) FNP White wrote Willett a prescription for Lortab and advised her to discontinue her previous pain medication. (R. 220)

On January 30, 2002, Dr. Samarasinghe performed a RF on Willett's left side and advised her to follow-up in one month. (R. 173-74) She was reexamined on February 22, 2002, and Dr. Samarasinghe noted that Willett had much improved range of motion with soft

8

paraspinas and noted her pain as being three-out-of-ten. (R. 171-72) He prescribed aquatherapy for lumbar stabilization twice a week, reduced her pain medication, and indicated the need for "self reliance" in improving the strength and condition of her lumbar paraspinal muscles. (R. 171)

In the interim, on February 7, 2002, Willett presented at the LGMC with complaints of severe back pain radiating to her legs subsequent to a fall on January 29, 2002. (R. 573) A physical exam revealed her to be in moderate distress, with decreased range of movement in her low back. (R. 574) Willett was given intravenous pain medication and provided with a prescription for Percocet. (R. 575) The following day, she was examined by Dr. Bolinger at IMA, for a routine flu exam. (R. 164) During the exam she complained that she was not sleeping well due to fluctuations in chronic pain. (R. 164) However, Dr. Bolinger found that she had only mild tenderness over her coccyx, no spinal tenderness, and excellent lower extremity muscle power. (R. 164) Dr. Bolinger noted muscle spasm and slight tenderness in the left paraspinous muscles and prescribed a muscle relaxant and hydrocodone for a few days. (R. 165)

Willett returned to Dr. Grayson on April 2, 2002, complaining that since Dr. Samarasinghe gave her an epidural, her back pain had worsened. (R. 214-215) Willett requested a refill of her Lortab prescription as her usual physician, Dr. Perry of Pain Management of Southwest Virginia ("PMSV"), was out of town and she had no refills left on her pain medications. (R. 214-15) But, during the exam, Willett informed Dr. Grayson that her pain was not any worse than usual and advised him she had an appointment to see another physician, Dr.

Leipzig. (R. 214) Dr. Grayson informed her that only a pain specialist could write or refill her pain prescription in the future, and briefly renewed her Lortab prescription. (R. 214)

Willet saw Dr. Leipzig on April 25, 2002. (R. 183) During the initial office evaluation, Dr. Leipzig found that Willett suffered from a mild, chronic compression fracture at T12, minimal mild-lumbar rotated scoliosis, and advanced degenerative disc disease at L5-1, with reabsorption of the disc. (R. 183) He also reviewed the January 23, 2001 MRI report which indicated degenerative disc disease, but no neurological compression or disc herniation. (R. 183) Dr. Leipzig's notes reflect that he believed Willett to be a candidate for additional conservative measures and recommended physical therapy. (R. 184)

Willett returned to Dr. Perry on April 30, 2002 for follow-up care for continuing pain in her head, neck, lower back, and bilateral lower extremities. (R. 259) She rated her pain a six-out-of-ten. (R. 259) Willet had some tenderness on palpation of her cervical spine, trapezius bilaterally, rhomboids and lumbar spine but had a negative straight leg raising bilaterally. (R. 259) Dr. Perry increased Willett's Lortab dosage to a maximum of eight tablets per day and gave her samples of Bextra, another pain reliever. (R. 259)

Willett was rechecked at LGMC on July 23, 2002, and a radial lumbar x-ray of Willett's spine revealed mild degenerative changes at L5-S1 and a compression deformity at T12. (R. 569) An MRI of the lumbar spine the same day showed a compression fracture at T12 and an annular bulge and spondylosis with mild shallow protrusion at L5-S1 resulting in moderate to severe left neural foraminal stenosis. (R. 570-71)

On August 13, 2002, Willett returned to IMA complaining of a catch in her back. (R. 646) Dr. Bauer's physical exam revealed some tenderness in the low lumbar area, but a

negative straight leg raising test bilaterally, as well as normal deep tendon reflexes, strength, and sensation in both legs, and normal gait. (R. 646) She was given a Lortab prescription. (R. 646)

Willett returned to CFM on October 30, 2002. (R. 191) During the exam she advised FNP White that she being treated by Dr. Perry at PMSV and Dr. Leipzig for her back pain, and needed help filling out her disability application. (R. 191) During the exam, FNP White found Willett exhibited no tenderness to percussion or palpation over her spine, only mild tenderness on palpation of her lumbar paravertebral musculature, and that she could bend forward and laterally. (R. 191) FNP White noted limited, guarded backward extension. (R. 191) Willett was provided with a new prescription for Zydone. (R. 191)

Eight days later, on November 7, 2002, Willet was reexamined at IMA by Dr. Bauer and again requested Naproxen and Lortab. (R. 639) Dr. Bauer did not prescribe a narcotic and, instead, prescribed anti-inflammatories and referred her to physical therapy for a functional capacity evaluation. (R. 640)

Willett returned to PMSV on December 6, 2002, for follow-up care for her ongoing neck, back, and bilateral extremity pain and asking for a refill of her Zydone prescription. (R. 257-58) That day she rated her pain as an eight-out-of-ten. (R. 257) On exam, Dr. Perry found that she had tenderness over her trapezius muscles bilaterally, lumbar spine, and paraspinal muscles. (R. 257) He also noted her straight leg raising was negative with a normal gait. (R. 258) Willett exhibited a normal range of motion in her shoulders and neck, except that her neck flexion was limited to 30 degrees. (R. 258) Dr. Perry found that Willett suffered from degenerative disc disease and prescribed physical therapy, denied the request to refill her Zydone prescription, prescribed Roxicodone, and directed a follow-up appointment in one month. (R. 258) There are

11

no further records from Dr. Perry until May 2003, yet it appears Willett's Roxicodone prescription was refilled and/or renewed several times in the interim.

On December 23, 2002, Willett presented to the LGMC Emergency Room with complaints of vomiting and diarrhea. (R. 543) She described her pain as a ten-out-of-ten, and requested narcotics. (R. 544, 546) She was given Zofran, an anti-nausea medication, and was released within two hours. (R. 547)

On April 10, 2003, an MRI of her lumbar spine revealed spondylosis at L5-S1 and an old, healed compression fracture at the T12 vertebra. (R. 301, 430) Additionally, an MRI of her sacroiliac ("SI") joint revealed no definite abnormalities. (R. 302, 429)

Willett returned to PMSV on May 7, 2003, and advised Dr. Perry that the Roxiocodone had a marked effect on her pain, her pain had decreased to a two-out-of-ten, and that she had increased her physical activity and yard work. (R. 255) Dr. Perry noted that Willett had some pain with palpation over her paraspinal muscles in the lumbrosacral area on the right side, but none on her left side, and pain on palpation over her right SI joint. (R. 255) Dr. Perry continued Willett's prescription for Roxicodone and advised a follow-up in one month. (R. 255) There are no further reports from Dr. Perry.

On June 5, 2003, Willett presented to the LGMC following an overdose of opiates, Benzodiazepine, and Cocaine and was subsequently hospitalized for several days.[2] (R. 466, 504-514) Subsequent to the overdose, Dr. Bauer noted that Willett had been discharged from Dr. Perry's practice without explanation. (R. 636)

---

[2]Lortab, Oxycodone, Percocet, Roxicodone, Vicodin, Ultracet, and Zydone are all opiates. http://health.yahoo.com

12

Dr. Bauer examined Willet on July 11, 2003. (R. 636-37) Despite noting her recent hospitalization for an overdose of opiates, Willett was once again given a prescription for Lortab with multiple refills, but was advised not to duplicate pain medications. (R. 637) Additionally, Willett was again referred to Dr. Samarasinghe and physical therapy. (R. 637)

On July 31, 2003, Willett presented at Lewis Gale Clinic for Arthritis and Rheumatology on referral from Dr. Bauer and Dr. Grayson for possible arthritis. (R. 455-57) Dr. Lemmer's physical exam notes indicate that Willett had tender points consistent with fibromyalgia syndrome. (R. 455) Dr. Lemmer noted full range of motion in her back and neck without pain on movement. (R. 455)

Shelia Peters, P.T., made a physical therapy initial evaluation on August 4, 2003. (R. 260-62) During that session, Willett reported that her pain was currently a five-out-of-ten, and ranged at times from as high as ten to as low as three. (R. 261) On palpation, Peters found that Willett was tender in the upper trapezius, the paraspinal, L4 and L5 region, and SI joint regions. (R. 261) She noted that Willett had a full range of motion in her cervical spine, lumbar spine, upper extremities, and lower extremities and only slightly decreased movement in the thoracic spine. (R. 261) Willett advised Peters that she is able to pick up objects off the floor and was able to complete her daily living activities independently and only needed some assistance with housekeeping. (R. 261)

Willett was reexamined by Dr. Lemmer on August 28, 2003. (R. 313-14, 453-54) She complained of pain and swelling in her left knee and right ankle and pain in her feet, shoulders, elbow, and hips. (R. 313, 453-54) Dr. Lemmer found that she had a full range of motion with

no pain or swelling in her joints and only some soft tissue tenderness in her scapula. (R. 313-14, 453-54)

During a follow-up exam with Dr. Bauer on September 16, 2003, Willett reported that she was going to continue with pain medication prescribed by Dr. Lemmer, and that she had significant improvement with physical therapy. (R. 625-26) Dr. Bauer noted that Willett's fibromyalgia was under good control. (R. 625-26, 628-29)

On October 2, 2003, Willett presented to Dr. Lemmer with complaints of pain in her left knee, feet, ankle, and hips and continuing pain in her back and shoulder. (R. 311) Dr. Lemmer directed Willett to exercise regularly and increased her Zydone. (R. 312).

Ten days later, Willett reported to the Carilion Roanoke Community Hospital Emergency Room for an ingrown toenail. (R. 413-24) Willett was prescribed Lortab. (R. 415) A follow-up exam related to the ingrown toenail and subsequent arch pain was conducted on October 27, 2003, by Dr. Zelen, a podiatrist at LGMC. (R. 319-20) Willett was offered an anti-inflammatory, but declined and requested a narcotic. (R. 320) The ingrown toe nail was debrided, but no narcotics were prescribed. (R. 320) On November 12, 2003, Willett returned again to the LGMC, complaining of arch pain. (R. 317) Dr. Zelen diagnosed her with severe plantar fasciitis, but once again Willett refused the recommended treatment of an anti-inflammatory and stated "she wanted a stronger pain medication for her problem." (R. 317) When Dr. Zelen refused to provide her with narcotics she became irrate and refused further treatment. (R. 318) Due to her behavior, Dr. Zelen determined that she must be discharged from his care. (R. 318)

14

Willett returned to IMA on November 21, 2003, complaining of stiffness in her lower back, across her upper buttocks, and maybe into both upper thighs. (R. 623) Dr. Zimmerman found that a lumbar spasm may have aggravated her underlying fibromyalgia. (R. 623-24) Dr. Zimmerman discussed postural techniques using a rolled up towel, and prescribed warm compresses and Lortab for pain. (R. 624)

On February 9, 2004, Willett reported to the Carilion Roanoke Community Hospital Emergency Department complaining of chest pain after slipping and falling on ice while walking her dog. (R. 391-99) She noted that she was out of her Lortab, and received another prescription for Lortab along with ibuprofen. (R. 391-93) The next day, Willett appeared at IMA, and reported that "[s]he went to the ER yesterday and she notes that she did not get it x-rayed and was told to take ibuprofen 800-mg three times daily and she was somewhat dissatisfied with the process." (R. 621) Dr. Zimmerman prescribed Percocet and ibuprofen as needed for her upper chest pain. (R. 621)

On May 12, 2004, Willett advised Dr. Bauer that she had occasional back pain, and once again was given a Lortab prescription with a refill. (R. 619) Less than a month later, on June 10, 2004, she was examined at the LGMC for increased, back, shoulder, hip, and leg pain. (R. 445-46) Dr. Lemmer found she had a full range of motion, no swelling, and mild tenderness in her parascapular region and low back. (R. 446) Willet was prescribed a new pain relieving drug, but did not tolerate it well and Oxycodone was substituted. (R. 442) Willett was advised to continue with a regular exercise program and begin water aerobics. (R. 449)

Willett reported to the Carilion Roanoke Community Hospital Emergency Department with complaints of gastrointestinal distress on June 27, 2004. (R. 362) She was given an anti-

15

nausea medication and a prescription for Lortab, and she was released the same day. (R. 367)
The following day, Willett reported to IMA for a follow-up appointment. (R. 615-16) Dr. Bauer
noted tenderness on palpation over the "classic fibromyalgia joints" and arthritic-like complaints
of pain in her knees. (R. 616) Willett was prescribed Lortab and ibuprofen. (R. 616)

On July 12, 2004, Willett presented at the Roanoke Valley Medical Clinic complaining
that she had felt poorly for several days. (R. 438-39) Her primary complaint was that she had
been experiencing an increase in her fibromyalgia symptoms and hip pain. (R. 438) Willett
indicated she had not suffered any notable injury, but had increased her household chores.
(R. 438) On exam, Dr. Seamon found that Willett was only mildly uncomfortable and had some
tenderness with palpation at various trigger points across the sternocleidomastoid, neck muscles,
lumbrosacral spine, and the trochanteric bursa on the right. (R. 438) Dr. Seamon ordered
another x-ray series of the hip and lumbar spine. (R. 438) Additionally, Willett requested a
stronger pain reliever and she was prescribed Percocet for brief use in place of the Lortab.
(R. 439)

During a follow-up visit with Dr. Lemmer on August 23, 2004, Dr. Lemmer found that
Willett had diffuse myalgia and arthralgias with tender points consistent with moderate
fibromylagia. (R. 441) He also indicated she had difficulty with concentration and memory,
probably "fibro fog," which was aggravated by sleep deprivation and the use of several
psychotropic medications. (R. 441) Dr. Lemmer advised Willett that she needed to reduce her
pain medications and that a regular exercise and physical therapy program would help relieve
her symptoms. (R. 441) Willett returned the following day, complaining that her pain was
worse and she wanted a handicap parking sticker. (R. 447) Again, Dr. Lemmer found she had a

16

full range of motion in her shoulders and joints with no pain or swelling. (R. 448) Dr. Lemmer noted some tenderness in her neck, trapezius, and scapula. (R. 448) Dr. Lemmer indicated that Willett needed to exercise and continue with physical therapy; additionally, he noted that Willett was continuing to take Roxicodone. (R. 448)

Willett returned on September 3, 2004, to the LGMC Emergency Room complaining of a sore throat and ranked her associated pain an eight-out-of-ten. (R. 495-500) She was prescribed an antibiotic and Vicoden. (R. 496) She returned six days later complaining of extreme pain in her right upper quadrant, nausea, and vomiting and requesting pain medication. (R. 469-82) Willett was given intravenous pain medication and within an hour, her pain had decreased to a two-out-of-ten, and by discharge had entirely dissipated. (R. 472, 482) No new pain prescription was written; however, Dr. Bauer referred her to Dr. Meyers for the recurring abdominal pain of which she now complained. (R. 599)

On November 24, 2004, during a follow-up visit at LGMC, Willett reported there had been no major change in her condition. (R. 602-03) She complained of pain in her back, hips, right knee, and ankle and stiffness lasting all day. (R. 602) Again, Dr. Lemmer found she had a full range of motion and no pain or swelling in her joints, mild tenderness in her right deltoid, scapula, and trapezoid, and recommended heat, massage, and an exercise program. (R. 603) Dr. Lemmer prescribed Oxycodone and ibuprofen. (R. 602-03)

On December 13, 2004, during a follow-up visit at LGMC, Willet reported that her shoulder pain had decreased. (R. 601) Dr. Lemmer found that Willett maintained a full range of motion without pain or swelling in her joints, except in the shoulders where there was a slightly

17

reduced range of motion with pain. (R. 601) Dr. Lemmer prescribed Dilaudid and Ultracet. (R. 601)

On December 28, 2004, Willett reported to Dr. Bauer that she needed more pain medication because she was going through her monthly prescription of Lortab in just two weeks. (R. 606) Dr. Bauer declined to write her another prescription. (R. 607)

On March 2, 2005, Willett was reexamined by Dr. Lemmer. (R. 685) Again she complained that her shoulders and hips hurt, but stated she was not exercising. (R. 686) He found that she continued to suffer from moderate and unchanged fibromyalgia syndrome and again recommended exercise and a walking program. (R. 685, 687) His examination notes reflect full range of motion without pain except for the neck which exhibited a slightly reduced range of motion with pain. (R. 687) Likewise, on June 23, 2005 she complained to Dr. Lemmer that she was hurting all over. (R. 688) On exam, he again found she had a full range of motion and no pain or swelling in any of her joints, with the exception of her right shoulder which had a slightly reduced range of motion with pain. In contrast to his March examination, in June Willett's neck exhibited a full range of motion without pain. (R. 689) Once more, Dr. Lemmer indicated that she needed to exercise to reduce the symptoms associated with fibromyalgia. (R. 689)

Willet was examined by Dr. Johnson of Carilion Rheumatology Clinic, on December 8, 2005 for a rheumatology consultation. (Pl. Mem. Summ. J. Ex. 1, Tab D) Dr. Johnson found that Willett met the criteria for fibromyalgia, but again advised her that she has a significant responsibility in her own treatment, including the need for regular exercise. (Pl. Mem. Summ. J.

Ex. 1, Tab D)  Dr. Johnson referred Willett to water therapy, advised her to begin an aerobic conditioning program, and would not prescribe any pain medication.

## B.

Dr. Lemmer's June 23, 2005 assessment of the impact of Willett's pain on her ability to work stands alone in this huge medical record as suggesting a serious functional limitation caused by Willett's pain.  Indeed, the vast medical record is remarkable for the lack of any clinical or diagnostic findings suggesting that Willett lacks the ability to engage in any substantial gainful employment.  Instead, the consistent pattern throughout the record is of a variety of subjective complaints of pain accompanied by requests and prescriptions for narcotic pain mediation.

When asked to specify the medical and/or clinical findings which supported his opinion as to Willett's exertional limitations, Dr. Lemmer penned "pain syndrome aggravated by repetitive use of limbs and bending."  (R. 673) Yet, there is no evidence in Dr. Lemmer's or any other treating physicians' notations indicating that Willett's pain is related to or aggravated by using her limbs or bending.  While the record does reflect sporadic limited range of motion for her neck, shoulder and low back, nowhere do Dr. Lemmer's examination notes reflect any pain or reduced range of motion in her limbs.

The record clearly establishes that between 1999 and 2005, Willett was treated for her complaints of back pain by multiple doctors, sometimes simultaneously.  The records reflect that plaintiff was prescribed narcotic pain medications repeatedly by her various doctors, yet none of those physicians advised Willett to stop working or recommend that she reduce her physical activity.  In fact, Dr. Lemmer repeatedly directed Willet to reduce her reliance on narcotics, to

19

take physical therapy, and to begin a regular exercise program. Several other treating physicians likewise advised Willett to begin exercising, stretching, and moving around more to manage her pain symptoms. Further, despite her complaints of pain, the physician notes reflect that Willett said that she was able to independently care for herself, complete household chores, and engage in activities such as walking the dog and doing yard work. The medical records reflect that Willett engaged in certain vigorous activities such as canoeing or "skinning the cat." Willett informed her physicians that her pain decreased with physical therapy and was well controlled with pain medicine, thus, allowing her to do more yard work and household activities.

Accordingly, the court finds that Dr. Lemmer's one-time conclusion as to Willett's physical limitations is not consistent with the length and breadth of the substantial volume of medical records in this case and, as such, is not entitled to controlling weight. Indeed, the ALJ's skeptical assessment of Dr. Lemmer's opinion is bolstered by the fact that Dr. Lemmer opined that Willett's condition existed with the restrictions noted from September 3, 2001, nearly two years before he saw her for the first time.

**C.**

There is substantial evidence in the record to support the ALJ's determination of Willett's RFC. After considering Dr. Lemmer's and other treating physicians' records and Willett's testimony, the ALJ determined that though Willett suffered from fibromyalgia, her allegations of totally disabling pain were inconsistent with the record. The RFC found by the ALJ tracks the Physical Residual Functional Capacity Assessment done by the DDS physician, Dr. Surrusco, on February 26, 2004. (R. 354-361) Consistent with this assessment, the ALJ determined that Willett maintained the RFC for some light work.

20

In determining if a claimant is totally disabled by pain, the ALJ must first consider if there is objective evidence of a medical condition which would cause the pain alleged. Craig, 76 F.3d at 594. Then, using the record as a whole, the ALJ must evaluate the intensity and persistency of the pain. Id. However, if an impairment, including pain, can be controlled by medication or treatment it is not totally disabling. See Roth v. Shala, 45 F.3d 279, 282 (8th Cir. 1995) The ALJ found sufficient objective evidence of a medical condition, in this case fibromyalgia, as a source of Willett's pain. However, the ALJ then found that Willett's complaints of disabling pain were not wholly credible in light of the medical record and, thus, found her pain was not disabling.

Willett testified her pain is so intense that she can only sit or stand for short periods of time, can only wash half a load of dishes without requiring a break, and can only walk half a city block before needing to sit and rest. (R. 47-48) However, this testimony stands in stark contrast to the amount of activity she told her physicians she was able to do. For instance, she told Dr. Lemmer on several occasions she walked her dog regularly, she advised her physical therapist she had no trouble taking care of her daily activities and only needed minimal help running her household, she advised Dr. Perry that she was increasing the amount of yard work she did, and she advised Dr. Bauer that following physical therapy she was able to do more physical activities.

Additionally, though Willet repeatedly returned to her physicians complaining of severe pain, on each instance her physicians, including Dr. Lemmer, advised her to increase her physical activity through an aerobic conditioning program, aqua therapy, physical therapy, stretching, and/or a walking program. During physical exams, despite alleging significant pain

in her back and joints, Dr. Lemmer repeatedly found she had full range of movement without pain or swelling in most of her joints. To be sure, Dr. Lemmer's records on occasion document a slightly decreased range of motion in Willett's neck, shoulders and/or low back with pain as well as tenderness in certain areas. Willett's physical therapist noted she had a normal range of movement in her cervical and lumbar spine, slight decreased movement in thoracic spine and full motion in her upper and lower extremities. Willett's other treating physicians' notations also record her complaints of severe pain, but their records do not reflect clinical or diagnostic evidence supporting Willett's claim that this pain has resulted in functional limitation precluding all work. Again, rather than confirm that her physical activities be curtailed, Willett's doctors repeatedly told Willett that she should increase her physical activity level.

Furthermore, the record establishes that Willett's pain was amenable to treatment. Dr. Bauer reported her fibromyalgia was well-controlled under Dr. Lemmer's care. Additionally, Willett's physicians advised her that with regular exercise her pain would be further reduced. Finally, by Willett's own reports, medication alone significantly reduced her discomfort.

The ALJ's credibility determinations are entitled to deference, and the court finds no reason to disturb them in this instance. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (holding that the ALJ's credibility determinations are entitled to great weight because the ALJ had the opportunity to observe the demeanor and assess the credibility of the claimant). There are no treatment records establishing Willett needed a reduced work schedule or was unable to stand, sit, or work due to pain. In fact, all of Willett's physicians directed her to increase her physical activity. The record plainly reflects that the ALJ considered all of the evidence of record and that his decision is amply supported. As such, the court finds substantial

22

evidence to support the ALJ's RFC determination.  <u>Mickles v.  Shalala</u>, 29 F.3d 918, 921 (4th Cir. 1994) (finding that a claimant's daily activities can suggest she is not disabled); <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999) (holding that a lack of physical restrictions from a treating source weighs against a finding of disability).

<b>IV.</b>

In the alternative to finding that the ALJ erred, Willett requests that the court remand this matter under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence.  Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council.  The court may remand a case under sentence six to the Commissioner upon a showing of new, material evidence, and when good cause exists for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g); <u>Borders v. Heckler</u>, 777 F.2d 954, 955 (4th Cir. 1985).

A reviewing court may remand a case to the Commissioner on the basis of newly discovered evidence only if the following four prerequisites are met:  (1) the evidence must relate back to the time the application was first filed, and it must be new, not merely cumulative; (2) the evidence must also be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must present to the remanding court at least a general showing of the nature of the new evidence.  <u>Borders</u>, 777 F.2d at 955; <u>see also</u> <u>Wilkins v. Sec'y, Dep't Health & Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991).

23

As noted above, Willett's new evidence establishes that subsequent to the disability hearing, she continued to be treated by Dr. Johnson for pain associated with fibromyalgia. However, consistent with the records of her previous treating physicians, Willett was again advised that she needed to begin a regular exercise program to manage the pain associated with this disease. Dr. Johnson did not indicate that Willett had any limitations which would impair her ability to work. Accordingly, the court finds this evidence would not have affected the ALJ's disability determination.

Additionally, Willett argues that new evidence detailing her subsequent treatment for severe mental illness warrants a remand. The record establishes, however, that Willett's alleged depression and anxiety were not debilitating. During an interview at the Appalachian Counseling Center on November 24, 2004, Willett advised the counselor that she did not have persistent sadness or feelings of being blue, frightened, angry, useless, or hopeless. (R. 668) In fact, she indicated she felt happy, confident, peaceful, and was looking forward to the future. (R. 668) Similarly, on the Beck Inventory questionnaire, Willett indicated that she did not feel sad, was not disappointed in her self, and that she only need to use a little extra effort to begin working. (R. 669-70) Based on her responses during the initial interview, her counselor determined that though Willett was depressed, she needed counseling only two to three times per month on an outpatient basis. (R. 661) An assessment of Willett's mental capacity to do work-related activities completed on October 20, 2005, revealed she had only a slight impairment in her ability to understand, remember, and carry out detailed instructions. (R. 690) Additionally, she had only slight impairments to her ability to interact appropriately with the public, respond appropriately to work pressure, and respond appropriately to changes in routine. (R. 691)

Willett's new evidence establishes that though she continued to receive counseling, now for alleged auditory and visual hallucinations, her psychiatrist found Willett's mood to be euthymic and that she was in no apparent distress.[3] (Pl. Mem. MSJ Ex. 1, Tab C.) As such, the court finds that this information would not have reasonably impacted the ALJ's finding that Willett was not disabled. Thus, a sentence six remand is not warranted.

## V.

For the reasons stated above, the court affirms the final decision of the Commissioner and grants the defendant's motion for summary judgment. In affirming the final decision of the Commissioner, the court does not suggest that plaintiff is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Willett's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence, and defendant's motion for summary judgment must be granted.

The Clerk of the Court is hereby directed to send a certified copy of the Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 31ST day of October, 2006.

Michael F. Urbanski
United States Magistrate Judge

---

[3]Euthymia is a state of mental tranquility and well-being, neither depressed nor manic. Dorland's Illustrated Medical Dictionary 650 (30th ed. 2003).

25